of the U.S. Supreme Court today, and that is Canales v. William Stephens. It's a death penalty case, and we'll hear first from Ms. Norris, who's representing Mr. Canales. Thank you, Your Honor. May it please the Court, as Judge Jolly noted, this is a death penalty case out of the state of Texas, proceeding in habeas corpus proceedings here today. The district court granted a certificate of appealability on a number of issues, but unless this court directs otherwise, I intend to address primarily here today, first, the need to remand this alleged procedural default, and second, the state misconduct claims. Specifically, on the question of Trevino, I do want to note before addressing that, that we do argue substantially in our briefing that we do not have a procedural bar. But even if a procedural bar is in place here, we submit that we can show and have shown cause and prejudice, but because the district court did not have the benefit of Trevino at the time, the district court never considered that. Do you think you have it on all the issues that are before us, on all, what, the 7, 8 issues? It looks like the Court paid more attention to the ineffective assistance than has for additional briefings. Does that make a difference, or do you think they're all issues in the same category? To the extent that this Court finds a bar, I think they are all in that category. But specifically, the ineffective assistance claims, the state misconduct claims, the magistrate judge found cause, but the district court found it unnecessary to address that. We submit there was cause because the evidence was withheld. The jury issues, I think, also would fall in there because the district court found that state habeas council could have discovered that information. So there again, we're talking about ineffective assistance. So to the extent that there is a procedural bar . . . It's pretty clear that your primary issue is ineffective assistance. Do you agree with that? It certainly is one of the primary. Again, the state misconduct as well. And what other issue on there deserves our attention after effective counsel? State misconduct. State misconduct. There are actually three state misconduct claims. But before I address that, specifically this Court, different panels, a number of cases have been remanded in light of Trevino. We cited those in a supplemental citation letter yesterday and attached all of those cases for the Court. And that only applies if there's a procedural bar, right? Yes. If we went to the merits, that doesn't have any application? That is true. Okay. Specifically, on the ineffective assistance, we submit that those claims are substantial and warrant relief should this Court decide to address the merits. In a case where Mr. Canales was convicted of killing another inmate and the state submitted substantial aggravation in response to that, the trial defense counsel presented other inmates essentially to say that Mr. Canales was a peacemaker in prison and a good artist, such that the state even mocked that in closing argument as a sad testament to a man's life, that that was all the mitigation that could be said. The prosecution even used the word pathetic. State habeas counsel did not address that at all. Specifically, in his affidavit, he stated that he believed his funding was limited so that he did not have funding to pursue a mitigation investigation, which was not true. And the prejudice of trial counsel's actions as well as state habeas counsel not developing that is substantial, as was submitted to the District Court and to this Court. There were numerous family members available that would have described Mr. Canales' deprived background. His father was a violent, irrational man. His mother was a neglectful alcoholic. His stepfather was extremely abusive physically to Mr. Canales and sexually abusive to his mother. Mr. Canales, even as a child, attempted to protect her. They had numerous, numerous moves through lice and flea-infected homes, and it goes on and on, where there was substantial mitigation available in this case that none of it was presented. What you really, it seems to me, it's important for you to spend a lot of time on is the prejudice that that caused you, caused the petition. I mean, he's a pretty gruesome guy, and I guess what you're talking about goes to what does it go to? Does it go to mercy, or does it go to the fact that he would not have been a danger inside prison? It goes to both, I submit. But part of the reason Your Honor points out we didn't address that in great detail in the briefing is that the District Court never reached the merits, which is why we have come to the Trevino issue, assuming we have overcome the procedural bar the Court finds . . . What would keep our deciding the issue on the merits if we decided that it was not procedurally barred? And if we decided, for example, that either way, I mean, whether counsel was ineffective and he was prejudiced, or he was not prejudiced, can we move right to it? How long has this guy been on death row? He was convicted and sentenced in 2000. Moving on. Certainly, this Court can address the merits, but again, as I noted, the District Court never reached it, and typically . . . Mitigation, witnesses other than family members or close friends who would testify, I mean, do we have anything like school records or any kind of prior hospitalizations or anything like that? The school records, and I believe there are some other records, but specifically the school records are there, and that is one place that . . . that is one way, primarily, that we were able to track how many different times Canales moved as a child. The family recalled multiple moves, but not how many, and in fact, he had moved approximately ten times over almost as many years, and that does come from the school records. What did the school records show as far as good mitigation evidence? He had average grades, but I would submit moving a child pretty much every year throughout his life, in the middle of school years, is itself mitigating. It is typical of . . . Mitigating what this man did? He moved around a little bit, so he was in prison and strangled somebody to death, and writes a letter boasting about it? Well, Your Honor, I . . . I submit that the mitigation as a whole explains who Andy Canales was and how he got to be the man that was tried and convicted. The trial is a snapshot, if you will, of what he did on one day. The mitigation packet that wasn't presented is the whole life, explaining how he got there. He didn't just wake up, or he wasn't born as a murderer. That is mitigation in itself, and to take the approach that he committed . . . Some people born as murderers? I would submit not, Your Honor, but I'll leave that to brighter minds than mine, but to simply say that because he committed a bad crime and had aggravation, we can't just say that no mitigation would have made a difference. That's never the case. But this is not just a bad crime, is it? Is there any other mitigation evidence that was found, other than family members and the school records? What else should have been offered? Well, Mr. Canales' mental health was never examined. That was one thing that in the initial petition in the district court, there was some argument that he should have a mental health evaluation. That was never done. So I submit also on the prejudice that the case isn't complete. In essence, what the district court focused on was the state misconduct and the procedural issues surrounding that. Did the school records show anything about his mental health that would have been helpful in mitigation? Not that I recall, Your Honor. But they are certainly in the court record and available for your own review. Specifically with the state misconduct claims, there are three of those. One was a violation of Messiah, in essence, an inmate working as a state agent soliciting incriminating statements from Mr. Canales. The second is a claim under Brady v. Maryland that the state withheld significant impeachment evidence related to Bruce Ennis, who was the state agent, as well as most of the other state witnesses. In essence, the state's case was built almost entirely on the testimony of witnesses and Bruce Ennis was the primary of those. The third is a claim under NAPU that Ennis testified in a false manner and the prosecution knew that. Specifically on Messiah, Ennis essentially approached the prosecution about cooperating as a state witness because he had pending charges. And as the magistrate court found, he did in fact become a state agent with the prosecutors encouraging him to solicit incriminating statements from Canales. And in his testimony during the trial, one letter was admitted that he stated that he asked Canales to write this letter and watched Canales tie it to a kite, if you will, a string that inmates use to pull items from one cell to another. That was what I'll call the confessional letter, Exhibit 27. In addition, in sentencing through Ennis, the state offered a second letter that was to have the prison gang conduct a hit on someone that he believed was an informant. A third letter allegedly written by Mr. Canales was sent to an inmate, Hannah, that also seems to threaten other witnesses. What the magistrate court found was that there was a Messiah violation with respect to the letter in sentencing asking for a hit on an informant. But we submit that all of those letters are tied together, the reason being that letter was tied to Canales by a fingerprint. The other two letters were tied to Canales simply by saying that all three were written by the same person. So when the district court found that it wasn't a material violation because of the other evidence, not all of that evidence could have come in if that one letter had been taken out. So we submit . . . I assume they would, but the state didn't rely on that. There were . . . I'm sorry, you're asking just if the prison had a sample of Canales' prints? Well, it would fingerprint everybody that's in the prison and . . . Yes. I would agree with that. And you would think that if they wanted to find out if this print was his on the letter that he authored, they'd run it through the print they had on file. Wow. They did, in fact, they fingerprinted him in the courtroom and matched it to the letter. Just to show the jury? Just to show the jury. Okay. So we don't dispute that the fingerprint on that letter, that the thumbprint, fingerprint, whichever it is, is Canales'. The question is, did he write that letter or did he at some point touch that letter? And we're relying on, as the jury did, Bruce Ennis, an inmate who was specifically cooperating with the government for that testimony. Ennis is also at the center of the Brady issue in that the state withheld evidence that wasn't discovered until the district court proceedings when the district judge . . . Mitigation. Is that right? We submit there was trial prejudice, but even if the court finds that there was not trial prejudice, there certainly wasn't sentencing. So we're arguing both. But, I mean, it seems to me that, well, that if the evidence was admitted at trial and then is admitted in . . . and nobody's contesting the validity of it, but they are . . . and then it's introduced in a sentencing phase, I mean, it seems to me that that is evidence that is proper before the jury, notwithstanding the fact that it may have been an evidentiary matter. I mean, does it tell you something about this man for the purposes of the jury? Nobody's contesting the truth of it, right? I don't mean . . . Nobody's contesting the truth of whether Canales wrote those letters? Yeah. Whether he actually wrote the letter. Is that even an issue here? Well, it certainly was contested at trial and has been contested throughout, but that's not the primary argument. The primary arguments are the State misconduct in terms of Bruce Ennis was soliciting this in violation of his Sixth Amendment right to counsel. That's the primary argument. But going back to the evidence, the hit letter, if you will, and the letter to the other inmate, while they were marked during the trial, they were not actually presented to the jury in the trial. They were marked because they needed the fingerprint on the hit letter to tie that to the other letter. So in essence, they marked it to show that his fingerprint is, if you will, on this sheet of paper, and the same person wrote that and wrote that. That's how they tied it in. So those two weren't actually in evidence during the trial. Well, anyway, I'm maybe completely off base on this, but it seems to me that if it was an evidentiary matter and the truth of it was not challenged, it tells you a lot about the defendant. It doesn't tell the jury a lot about the defendant as to whether he was a future dangerous. I don't think you should be able to consider it anyway, maybe not. Assuming Canales wrote those letters and they're admissible, yes, but we submit that they were not admissible without even getting to whether we dispute, and we do, that he wrote them. They were not admissible. The evidence... And can you tell me why they weren't admissible? I'm sorry? Why weren't they admissible? One wasn't admissible because of the Messiah violation, and we submit that without that found it impossible to get those letters in. Even the prosecutor during the trial stated that he needed that letter in order to get the others before the jury. Was there also some handwriting comparison? There was an expert that simply said that all three of those documents were written by the same person. There was Bruce Ennis, the inmate, and there were several prison officers who testified that they were familiar with Canales' handwriting, and they identified it as his. So there would have been lay testimony that certainly the defense would have been able to challenge better than an expert and fingerprints. With respect to the withheld evidence, most of that relates to Bruce Ennis, but not all of it, and there are a number of categories. One of the items that was not disclosed, we submit, was a prior statement by Ennis that is the underlying facts related to the Napu claim. It also was not disclosed that Ennis himself was a suspect in the murder that Mr. Canales was convicted of. The district court found that that was simply cumulative to the fact that the jury already knew that Dickerson had a deal to basically get a reduced sentence on lesser charges. We submit that facing two felony counts is far different than facing an actual capital murder conviction. Bruce Ennis, as a suspect himself, had extreme motivation to not only produce evidence but to lie to produce evidence against Andy Canales so that he himself could escape the execution chamber. That is very different in kind, and I submit simply is not cumulative. Bruce Ennis also had additional charges that were brought while he was acting as a state agent. He encountered a new felony case of possession of a deadly weapon in confinement that was dismissed. All of that without any knowledge by the defense. The district court found that he certainly did receive special treatment, but again said that it was cumulative to anything else. Ennis and essentially all of the inmate witnesses received . . . But now how does this affect, assuming all of that, how does it affect the incriminating statements that he made in the letter itself? Assuming that Ennis didn't receive it correctly, how does that . . . it still seems to me that evidence is admissible for the purposes of showing the character of this petitioner. Even if one assumes that those letters are admitted, outside of the letters, which the state was essentially relying on Bruce Ennis to get in, and Ennis was the only person that directly brought in evidence of one, a confession, and two, exactly what happened in that cell. The state's entire case was based on that. Outside of that, other witnesses, other inmates described seeing Canalis go in the cell, go out of the cell, in the area. But the essence of the state's case is through Bruce Ennis and those letters. I agree with Your Honor there. But those letters that admittedly were written by the petitioner, the confession, he confessed. That was challenged at trial, and we do not concede that he wrote those letters. We concede that he touched one of those letters at one point, the hit letter. All of the state's inmate witnesses received consideration . . . Could you offer any suggestion as to who may have written them? If he didn't? We did not, and the burden was not on the defense at trial to explain that. They did argue that they were challenging those letters, but did not offer a different theory, and I can't offer one now. Other than to say that there were numerous inmate witnesses, all of whom had motivation because of favorable treatment by the state, and in order to please the state, I see that my time is up. Thank you. You're facing time for rebuttal, so thank you for your argument. And now, Mr. Frederick, will you represent the State of Texas? May it please the Court. Mr. Canales has not denied writing the confessional letter, and he has had every opportunity to do so. Whether or not he bore the burden of proof at trial, he has certainly had every chance in his habeas proceedings to say to this Court and every other Court, I did not write the confessional letter. There is no limitation on his ability to do that. Certainly no limitation on his incentive, but he has not done it. And that is the reason that he cannot show prejudice on any of his claims. I'd like to start with the Wiggins claim, the defaulted ineffective assistance claim. The first question— Well, you said, I mean, if the evidence was—go ahead, did you want to— No, I would just—before we get to that, what did the Court of Criminal Appeals do as far as, is there a police—did they go into the merits, or do we have a procedural bar? What standard are we using here, depending, I guess it depends on what the Court of Criminal Appeals did, and so could you try to clear up for us the State's position with regard to that matter? Absolutely. So as Your Honors noted, the first question is, what did the CCA do? Did they resolve it on the merits, or did they dismiss it on procedural grounds? If the CCA reached the merits, if they got into whether Mr. Canales presented a prima facie case on his Wiggins claim, that means that to the extent this Court reviews that claim, it applies AEDPA's relitigation bar. And that is certainly no greater chance for relief for Mr. Canales because it is impossible to say, based on the evidence that Mr. Canales has presented, that it would have been unreasonable or contrary to clearly established federal law for the Court of Criminal Appeals to deny his Wiggins claim on the merits. If, on the other hand, and the State's position is that there was not a decision on the merits, that this was a procedural ruling by the Court of Criminal Appeals, the reason is that the text of the CCA's order on Mr. Canales' second State habeas petition did not contain any indication that the Court reached the merits. And as this Court has explained in the case of the Wiggins claim, that's a question because it didn't have any indication that he based it on a procedural bar or the unavailability of the evidence. I mean, so if you didn't, I mean, who gets, say it's a tie, who gets the benefit of the tie? I mean, I notice you've said it in different ways in who gets the benefit of the tie. That is, did he decide it on unavailability or did he decide it on the grounds that there was no Wiggins claim? Right. To be frank with the Court, it would be better for the State if there were a merits determination. But I don't think if there were a merits determination by the CCA. But I don't think that that is what this Court's precedents prescribe. In Rocha v. Thaler and Ballantyne, this Court has given great attention to ambiguous or you can call them boilerplate if we want to, but decisions by the CCA denying petitions as an abuse of the writ that do not specify the particular basis of the decision. And the general rule from this Court's decisions is that if there's not any indication that the Court did rely on Federal grounds, then the inference is that the Court relied on unavailability and it dismissed on procedural grounds. And I think this case is a fairly straightforward application of that rule, only except for the fact that the Court did obviously ask for briefing on Wiggins. And they asked for briefing on whether, one, whether it was a new law or such an extension of old law that it could excuse a procedural default. And two, if so, what was the standard? Now, aside from what the State believes is the only permissible inference to be drawn from the text of the Court's actual order, it is more reasonable to read that, notwithstanding the request for briefing on Wiggins, as a ruling on availability because Wiggins itself is a Strickland claim. It applied Strickland to a certain set of facts, but it did not announce new law. And as for availability of the facts, by definition, the facts underlying Mr. Canales' Wiggins claim were available at the time of his initial habeas petition in State court. He knew his family history. He knew his school history. The witnesses who he now says would have testified were there and presumably knew then what they knew when they submitted affidavits. Do we know if it was raised? I mean, there were all sorts of issues raised the first time around. Do we know if ineffective assistance of counsel was raised first time around with the first habeas? It was, but barely. There were a couple of ineffective assistance claims in the initial State habeas petition. Mr. Canales' claim 13 was ineffective assistance based on failure to object to the grand jury foreman's testimony. There's no specific allegation in the petition of deficient performance, nor is there a citation to Federal law. So it's not at all clear that a Federal ineffective assistance claim was raised. There is also at claim 23 of his initial State habeas petition a claim of ineffective assistance based on failure to secure a ruling on admission of gang records. Again, no specific allegations of deficient performance. So I say barely because there are some bare allegations of ineffective assistance, but they are very minimal, especially. Nothing to do with the mitigation investigation? That is correct. Nothing to do with the mitigation claim. As I understand, the trial counsel did absolutely no investigation on mitigation. I would not agree with that. And here's why. I understand that Mr. Canales has said trial counsel did not interview family members, did not check for school records. And I have no reason to dispute that. I think that's what the affidavit from trial counsel shows. However, it's not accurate to say that trial counsel did nothing because trial counsel stated that they did talk to Mr. Canales about his family background. And I don't think that's insignificant because, as I just mentioned, the person who knows about his background is Mr. Canales. And I think this implicates the defective or the deficient performance prong of Strickland, which hasn't gotten as much attention before this Court. But it's important to remember that Mr. Canales seems to want to assume the worst about trial counsel. They didn't conduct any interviews with family members. Therefore, they did absolutely nothing. But Strickland requires courts to assume much better than that. In fact, it creates a strong presumption that counsel's decisions were the product of reasonable professional judgment. Did counsel testify in the habeas proceedings? As far as I know, counsel submitted affidavits. I am not aware that they actually testified in the habeas proceedings. Did he get any kind of reason for not pursuing more investigation than he conducted? Not that I am aware of, Your Honor. The statement I'm aware of in the affidavit says, we discussed Mr. Canales' background, his family history. Now, what I would say on as far as defective performance goes, taking that statement that they did at least inquire and that there is a strong presumption, there is an inference that can be made that counsel heard what they heard from Mr. Canales and decided that in light of the questionable benefit of that testimony and any number of things they could have considered, they could have made a reasonable professional judgment that this is not where we're going to spend our time in mitigation. Now, it's significant because we don't know a lot about that. What were they arguing to the jury that would be a basis for sparing his life? It's pretty hard on these facts, I agree with that, but they must have come up with something. The points that were made in mitigation to the jury were that Mr. Canales was a well-behaved inmate, that he was a peacemaker, that he mediated disputes among prisoners, and that he was a good artist. How can you stay there with a straight face and say that he mitigates disputes by strangling people to death? That mitigated that story. I can only assume that they were talking about everything but the incident with Mr. Dickerson, that generally Mr. Canales was appeasable. Mr. Canales wrote all of these threatening letters. He wanted anybody that he had a disagreement with or that was . . . The farmer of mitigation. I guess it was. Well, to be fair to Mr. Canales, I think that, and I don't know, I can't recall exactly what statements trial counsel made in the mitigation phase, but I suppose it's possible that they could have argued that, yes, we have these threatening letters about here's what I'm going to do to informants. I suppose those could be discounted as bravado and trying to put on a tough exterior in prison. I just don't know. How long had he been incarcerated when this incident happened? He had been in since 1995. So when this incident happened, around 12 years. So the previous 12 years of his life had been in an institution? That's correct. So if we were to go into childhood and other matters, we're going way back before the 12 years, I guess. And his lawyers did, in saying he was a peacemaker and an artist, were in effect covering the 12 years previous to this incident, what type of person he'd been the previous 12 years in the institution. That's correct, and I think that's a critical point when we get to the prejudice prong of the cause and prejudice inquiry, and ultimately under Strickland and Wiggins, is that we have to consider both the content of the unintroduced, undiscovered evidence, his family members, testimony. We also have to consider the context in which the jury would have heard it. The content was that he had had a terrible childhood. Nobody can deny that. I would not wish that on any child, and nobody would. But what it doesn't show are, it doesn't show neurological defects, it doesn't show a diagnosis, abnormal development. It shows a terrible childhood, and that's it. From the time that he was an adult or semi-adult, had he been in prison for that entire period of time? Did he ever have a job or do anything outside? He was out. He had gone to prison once. How old was he when he first went to prison? I couldn't swear to it. I believe he was a late teenager. And then he did come out, and then he was out of prison at the time his mother got sick and died, and that's when his sister said that he went off the deep end, started using drugs, getting into really bad stuff, and pretty soon after that, he went back to prison. And I think that was it. He was there for the remainder of his life. Well, he couldn't use that. I mean, that, you know, you could try to say the loss of his mother is mitigating. In fact, and there is some authority to the effect that the jury is entitled to hear the man's life. I mean, we're not talking about mitigating this particular crime. We're talking about mitigating the death penalty. Kind of personalizing the defendant, in other words. Personalizing the defendant. Who was he close to? Family members? His sister? Anybody else? As far as the record reveals, I think there is evidence that he was close to his sister. He defended her, you know, when they were living with abusive step-relatives. I'm not aware of anyone else. Is there any apparent reason why counsel wouldn't have at least talked to the sister? You know, that is a good question. And I think it cuts different ways. It deserves a good answer, too. So let's have it. Right. It brings up what we don't know about what Mr. Canales discussed with his counsel. And Mr. Canales hasn't told us that. And since he is raising an ineffective assistance claim based on what his counsel failed to do, I think it is incumbent on Mr. Canales to say, here's what I told them, and here's what they failed to follow up on. If Mr. Canales was close to any relative who would have provided helpful testimony, one would think that's the first thing he would say to his lawyer. What is your best case for the complete failure to do any investigation into the background of a warrant sentence to death that is not ineffective counsel? What is the strongest case you rely on for that? I mean, it seems on that, I mean, you... I guess you're just relying on the fact that there was no prejudice, that you can't prove the second prong because you seem to admit the first prong, that it was ineffective counsel. I don't mean to admit the first prong. And I think probably the best answer I can give now is my best case is Strickland and the presumption of competent performance. I think it is Mr. I don't think, it is... That's not what we're asking you. Why is it competent performance or what is your authority that it's competent performance under any circumstances for an attorney not to perform some investigation? I mean, when there's an obvious avenue, you got a family member that he's close to who's presumably available to counsel. Mm-hmm. I would respond that we don't know if it was obvious. Why? We don't know if that was obvious because Mr. Canales has not told us... Does that help you? It does because it is Mr. Canales' burden to prove his ineffective assistance claim to show that there was, in fact, deficient performance. I cannot give the court a case where counsel did absolutely nothing. Well, I mean, how do you excuse counsel's performance if the client says to him, I don't want you to do any mitigation? And so he doesn't do any mitigation, and yet there's a world of mitigation evidence out there. Would that ultimately excuse the lawyer from not conducting an investigation, not withstanding the wishes of his client, and not do so? Yes. If the client instructs the lawyer, I want you not to put on a mitigation case, yes. The lawyer is not required to override his client's instructions. Now, I'm not saying that that's what's at issue here. That was at issue in a recent case before this Court, Rousseau v. Stevens. I'm not saying that's at issue here. What did we say? What did we say? That well-settled precedent is that it is not, you cannot fault the lawyer for not overriding the wishes of his client not to put on a defense or a mitigation case. Well, not to put a witness on that the client doesn't want put on, but I'm not sure that he still doesn't have an obligation to look into it and see what's out there. I mean, you've got a case for that? That he doesn't have an obligation to at least look into it and see what's out there? I can't give you a case that says that. I can give you, on the deficient performance prong only, I can respond that I'm not sure. I would certainly dispute that counsel did absolutely nothing. And I would rely on the basic rule of Strickland and Wiggins that the lack of investigation whether that is reasonable depends on what the decision, what decision was made by counsel before deciding not to conduct a further investigation. And without any evidence from Mr. Canales of what he discussed and what leads he provided, there is a serious question whether he could ever meet that prong. But the, I want to be very clear though, prejudice, he cannot meet prejudice. That's what you better stand on. And that is why I am happy to stand on prejudice. Let's have your best argument on that. Why they would have been, why he had under the case authority that we can say that he suffered no prejudice even if the evidence they are asserting now was mitigating evidence was introduced and heard by the jury. Mr. Canales' burden is to show a reasonable probability that but for his counsel's... No, no, no. I'm saying let's assume that all of this evidence was available to go to the jury. How do you say that it would have no mitigating effect upon the jury's decision to send the man to death? First, what did the evidence show? What? First... Exactly. So tell me. The evidence showed that he had a terrible childhood. That's it. Actually, that's not it. The evidence also showed that he had been involved in crime from an early age, that he had a propensity towards violence, so much so that a childhood friend of his mother's said you ought to get that boy checked out. I think there's something wrong with him. He has had an anger management problem throughout his adult and semi-adult life. He has had a history of drug use before he was incarcerated. And I think most importantly, he was... The jury knew he was a member of the Texas Mafia prison gang. How long did that come out before the jury? The gang membership did. Everything before the gang membership would have been... It's the unintroduced mitigating evidence about his family. There's also the psychiatrist's testimony. This is the unintroduced Wiggins evidence. The psychiatrist determined after examining Mr. Canales that his gang membership was so important to him that he would just as soon die as not be a member of the gang. Now, that's his own psychiatrist? Yes. That is the psychiatrist that was retained by habeas counsel to examine him. That was his conclusion, unless I am terribly mistaken. And I hope counsel will correct me if I am. But the record indicates that was his psychiatrist that said he cannot deal without being in a gang. And the context of all of that evidence is critical because what did the jury know? What else did the psychiatrist say? He said that he perceived the world as a very dangerous place. What did the psychiatrist say about the effect of mitigating evidence? Did he say that the fact that he had a childhood in which he was mistreated significantly and so on had a part in forming the man the way he was to strangle people to death and that sort of thing? I'm not sure that he drew that direct connection. But I think it is fair to say that after reviewing the childhood, the psychiatrist did conclude that his childhood experience made him seek a social network in gangs. He didn't have a stable family, so he sought to replace that with gang membership and that he saw the world as a very violent, dangerous place, which it surely would be if he remained in prison for life. And I think that is the key context because the jury knew at the time they considered his sentence that he was a capital murderer because they had just convicted him. They knew he was a gang member in a prison gang and they knew that if they exercised mercy or gave him a lighter sentence for whatever reason, that sentence would be life in prison. Now, I think it's important to consider what is the purpose of Wiggins-type evidence, mitigating evidence, about what kind of person the prisoner is. As I have always understood it from the cases that apply Wiggins, it is to humanize the defendant, to give the jury some reason to exercise mercy or to be lenient because he may, you know, if he gets life instead of death, he may turn his life around, he may become a productive member of society. In this case... Well, whatever society he's in. But in this case, the jury already knew what happened when he was in prison for 12 years. And I think that is a... Did he have any record of violence before this particular incident? I cannot recall... You don't know much about your case. You should know more about the case than you know. Go ahead. I'd like to move to the Messiah claim, which is his third claim. This claim, the denial of relief, should be affirmed because Mr. Canales cannot show prejudice. This is the claim that focuses on the letter that Bruce Ennis secured from Mr. Canales allegedly at the direction of prison officials. It's a very simple causation problem with this claim. Mr. Canales says that this letter that was wrongfully obtained in violation of his Sixth Amendment rights was critical for the introduction of the confession letter and the third letter in which he had threatened to retaliate against other prisoners. That is not accurate. The confessional letter and the third letter in which he threatened to retaliate against other prisoners were introduced in the guilt-innocence phase. The letter that is subject to the Messiah claim was introduced in the punishment phase. The fingerprint evidence was not necessary to introduce the other two letters, which were more than sufficient to establish Mr. Canales' guilt and his propensity for violence. In fact, the letters, I'm sorry, the confessional letter went in through Mr. Ennis, not through a fingerprint expert. And Mr. Ennis, as well as two prison officials who had reviewed lots of Mr. Canales' mail, all testified that that is Mr. Canales' handwriting and it is very distinctive handwriting. I have read several pieces of mail from him. That's him. Now, they suggest that that is somehow entitled to less weight or is not sufficient because it would be lay testimony. But lay witnesses are entitled to testify based on their own sensory perception. And that is exactly what these three witnesses did. So the letter subject to his claim was not at all necessary to introduce the confessional letter. Moving on to the Brady claim, again, the critical problem with this claim is prejudice. Mr. Canales... In a capital case, I don't understand the state withholding Brady material. I mean, if you put on these inmates and they don't disclose the... I mean, if it's true, they didn't disclose the inducements and they didn't prosecute on the claim. I mean, I just... I think that's inexcusable. I mean, do you have an excuse for that? I don't have an excuse for it, and I'm... The best I can do in response is to say that I am not sure that this was a deliberate action. I know that that is not what Brady is about. It does not require deliberate concealment, but it sounds, from what I can tell from the record, that the prosecutor gave what he had and perhaps he was negligent in not exercising greater control, but I don't think there was a deliberate concealment. More importantly, as to the prejudice element, Mr. Innis, he told the jury that he was receiving benefits for testifying. He said, I have been charged with two very serious offenses that each carry a penalty of 99 years, and in exchange for my testimony, I expect that they will be reduced to concurrent three-year sentences. There was some cross-examination about his cooperation. Yes. Yes. So the jury knew that he was getting a substantial benefit. Now, as for his being a suspect in the murder, the record does not indicate that he was ever charged. It's not clear how much of a suspect he was, whether he was more of a suspect than anybody else who was in the prison gang or in that area of the prison. So that just doesn't prove much. Now, as for the continuation in gang activities, that's also very vague. And in fact, Mr. Innis told the jury, I am, quote, in the process of getting out of the gang. So the jury was not affirmatively told by Innis that I'm not a gang member anymore. Now, as for the false testimony, I want to briefly address that. Very briefly, the notes from the interview, we don't know whose statements they were recording, when they were recorded, and whether they are accurate. We don't know what letter they are talking about. So they fail the first element of the claim, which is that there must be false testimony. They do not prove that Mr. Innis's testimony was false. Okay. Thank you, Mr. Frederick. Ms. Norris, we'll hear from you. Thank you, Your Honor. May it please the Court. Specifically, starting with the false statement, as Mr. Frederick was just addressing, the magistrate interpreted those notes that are to say that that could have been an interview of someone else other than Innis. On that particular point, again, we had asked to depose the other investigator that both of the state's witnesses by deposition said Roy Smithey was the investigator that likely wrote those notes. We were denied the opportunity to depose him. So if there is any question at all about whether that was, in fact, an interview of Bruce Innis, we submit again that we should be remanded and that issue developed. Specifically, as it relates to ineffective assistance of counsel, it is true that trial counsel did something. They called a few inmates to say that Mr. Canales was a peacemaker and a good artist. There is no showing whatsoever or there's no argument. Trial counsel's affidavit was the very first exhibit attached to the initial habeas petition. Trial counsel says simply that they talked to Canales. They did not investigate mitigation beyond what they presented. What about the psychiatrist? There was a psychiatrist that interviewed Mr. Canales and talked to the defense counsel? Initial habeas counsel, I was not Mr. Canales' counsel then nor was Mr. Boyson here with me. But initial habeas counsel did offer an affidavit of Dr. Sauter that is attached to the initial habeas petition. He did not examine Canales. He reviewed essentially the affidavits and the information from the family members that was developed. Based on that information, he drew conclusions that essentially Mr. Canales' horrible background led him to deal with his trauma, likely post-traumatic stress disorder. But the trauma of that background, he dealt with that in two ways. One, by turning to drugs and alcohol. And two, by turning to gangs. There are two or three paragraphs of his affidavit that address that gang members, although most of us don't view them as a healthy society, they are a society. So to a young man who essentially is neglected, beaten, left on his own at home looking for kinship and a place of acceptance, that's how lots of young men turn to gangs. So yes, there is that explanation and there was that affidavit. In addition, the government argues essentially that Mr. Canales should have testified or provided an affidavit to say that defense counsel didn't do what he said. There's no requirement that Mr. Canales waive his right to silence in order to prove his claim. Defense counsel presented affidavits. The family members presented affidavits saying that they were ...